**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA,**
       **Plaintiff,**

*vs.*                                                    **CRIMINAL ACTION NO. 2:13cr4**
**WILLIAM TRENT RICHARDSON,**
       **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This matter is before the undersigned for consideration of Defendant, William Trent Richardson's "Motion to Suppress" [D.E. 25] filed on March 30, 2013. The United States filed an "Objection to Defendant's Motion to Suppress" on April 1, 2013 [D.E. 26].

On April 9, 2013, came Defendant, in person, and by counsel, Dwight R. Hall, and the United States by its Assistant United States Attorney, Stephen D. Warner, for hearing on the motions.

### I. Procedural History

Defendant William Trent Richardson was indicted by a grand jury attending the United States District Court for the Northern District of West Virginia on February 20, 2013 [D.E. 1]. The 32-Count Indictment charges Defendant and his two co-defendants Kristin Elaine Dye and Brandon Edward Anderson with a Methamphetamine Conspiracy (Count One); Maintaining Drug-Involved Premises - - Aiding and Abetting (Count Two); charges Defendant and Dye of Possession of Material used in the Manufacture of Methamphetamine - - Aiding and Abetting (Count Three); and charges Defendant alone in 10 counts of Possession of Pseudoephedrine to be used in the Manufacture of Methamphetamine (Counts Four through Thirteen); and two counts of Attempted Possession of Pseudoephedrine to be used in the Manufacture of Methamphetamine (Counts Fourteen and Fifteen). A summons was issued, and Defendant was arraigned and pled "not guilty" on March 12, 2013.

## II. The Contentions

Plaintiff contends:

1. The warrantless search of Defendant's residence violated his Fourth Amendment Rights.

2. The subsequent search warrant was obtained using the illegally obtained evidence and should be suppressed as "fruit of the poisonous tree."

3. Jill M. Sparschu's testimony should be suppressed as "fruit of the poisonous tree."

The Government contends:

1. The officers had cause to believe that they, and the persons inside Defendant's residence were at serious and imminent risk of harm due to the likelihood that methamphetamine was being actively manufactured inside.

2. They entered the residence only to preserve evidence and to remove persons inside.

3. It was inevitable that the officers would find Richardson and Dye inside the residence and smell the meth lab that they had already smelled.

## III. Testimony and Evidence

The undersigned heard the testimony of Upshur County Sheriff's Deputy Sgt. Marshall Powers, Upshur County Sheriff's Deputy Cpl. Dwayne Linger, and West Virginia Senior State Trooper Victor Pyles for the government, and Upshur County Sheriff's Deputy Tharen Caynor, Mary Frances Marsh, Tiara Howard, William Trent Richardson, and Wilma Darlene Richardson for Defendant. The Court also admitted six joint exhibits (photos of the exterior of the trailer that was searched) and three Government exhibits consisting of Trooper Pyles' Criminal Investigation Report, the Search Warrant, and photographs of items found inside/outside the trailer.

The credible testimony of the witnesses was that Trooper Pyles had mentioned to Sgt. Powers

Defendant's excessive pseudoephedrine purchases possibly a month before the incident that is the subject of this motion. On September 13, 2012, they met and decided to go to Defendant's residence, knock on the door, and just ask him about the pseudoephedrine purchases.

Sgt. Powers testified that he has had experience in investigating meth labs, although he is not clandestine-lab certified. He has probably investigated 12 meth labs and has smelled them before. He described the smell as chemical-based and very distinctive, stating: "Once you smell one, you never forget it." When the method of manufacturing changed from lab to the shake and bake method the odor was not quite as strong, but still had the same, distinctive odor.

Sgt. Powers was accompanied by Trooper Pyles, and Deputies Linger and Caynor when he went to speak with Defendant about excessive pseudoephedrine purchases. He explained the reason for having multiple officers was that when there was any chance individuals were manufacturing meth, "you never know what you will come upon. You would rather be over than under-prepared." The trailer was in a rural area. Sgt. Powers exited his vehicle and went up to the front porch of the defendant's trailer. Other officers walked toward the porch with him. He smelled a meth lab. He recognized the odor immediately from his experience. He knocked on the door. No one answered. He talked with Tpr. Pyles, who also walked up onto the porch. The odor was very, very strong. If the meth lab was not active, it had "just been active." The two officers discussed the danger of a meth lab in a single-wide trailer. The chemicals were very toxic and were a health hazard. They discussed whether they thought anyone was inside. While talking they heard movement – footsteps– inside the trailer. There were also two cars parked outside, and the lights were on inside the trailer. The officers discussed whether they should enter for safety purposes.

At that point Sgt. Powers testified he received a phone call from Deputy Linger who was

positioned in the back of the trailer. Deputy Linger told him he saw a man inside in the kitchen area, who appeared to be hiding stuff, hunkering down behind a counter, and hiding jars in cupboards. Linger also said he smelled meth as soon as he approached the trailer. Sgt. Powers peered into a window and saw Defendant also. The officers decided to make entry and get the occupant(s) and officers out of danger. They then made entry by kicking in the door and detained Defendant and took him out of the trailer and put him in a police cruiser in handcuffs. They found co-defendant Kristin Dye in a back bedroom and also removed her from the trailer and put her in a cruiser. They did not seize any evidence. They detained the two outside in the fresh air.

Trooper Pyles then went to get a search warrant for the residence. Sgt. Powers went to Defendant's parents' house and told them their son had been arrested. He told them they had kicked the door in after smelling an active methamphetamine lab.

Sgt. Powers testified the officers did not find an active meth lab upon searching, but they found several labs that were not active but "not that old" in his opinion. When the three or four bottles were set on the porch, the chemicals began reactivating and smoke began coming out of them.

Corporal Linger testified he also had experience with meth labs, having been involved in probably 10 meth lab investigations. He was not clandestine lab certified, but he had probably smelled 15-20 meth labs. The odor was "very distinctive." It was a chemical smell with, to him, a sweet odor also. It was "very unique–you can tell the difference between it and, say, a body shop."

Cpl. Linger testified he had also met with Sgt. Powers and Trooper Pyles to talk about Defendant's purchases of pseudoephedrine. He testified that on September 13, 2012, as soon as he got out of his vehicle and walked around it (still on the road) he could smell a meth lab. He testified he called Sgt. Powers and told him he saw a male in the trailer who appeared to be trying to hide

4

evidence. He confirmed to Sgt. Powers that he smelled a meth lab. He believed Sgt. Powers made the decision to enter the trailer. After Sgt. Powers and Trooper Pyles went in the front door, he went through the back. The door opened inward and there was nothing in the way. He saw a female, told her to get on the floor, and handcuffed her. He looked for other occupants, and, finding none, the officers took both Defendant and Dye outside. They were taken away from the trailer because the small was so strong. The officers did not retrieve any items. They took nothing out. They got the people out, backed out, and Trooper Pyles went to get a search warrant. It took him about an hour to obtain it. During that time, Cpl. Linger took Kristin Dye into a cruiser and interviewed her.

Trooper Pyles testified he had been with the West Virginia State Police for five years. He was clandestine lab certified. He had taken a 50-hour haz-mat class in about 2011, and was certified to sample and dismantle meth labs. He responded to meth labs in several counties. He had seen at least 50 meth labs, and had smelled all of them. He would sample and dismantle the meth labs. He knew through experience and training that meth labs are all dangerous. They can be explosive, can burn the skin, are hazardous to inhale, and flammable. In the close confines of a small trailer, they are even more dangerous because the same amount of vapor is confined in a smaller space and is more concentrated. The right fuel/air mix could cause an explosion. In the past two years the "shake and bake" method had become more popular. It had a strong chemical odor, sometimes smelling more like sulfur, sometimes phosphorous– depending on the "cook." He had seen meth labs blow up, and had seen other "bad things happen."

Tpr. Pyles had seen the Board of Pharmacy record of Defendant's purchases of pseudoephedrine. He contacted some people, and had gone to Defendant's residence at least two times to talk to him about the purchases. There was evidence someone was home but no one would

answer. There had been calls from concerned citizens. He and the other officers met and discussed the issue, and decided to go to Defendant's residence to talk about the purchases. They drove right up to the trailer. Sgt. Powers knocked on the front door. There was an immediate smell of a meth lab. He was concerned about the people inside the trailer.

Trooper Pyles testified that Sgt. Powers had gotten a phone call from someone who saw Defendant removing things from the kitchen, trying to hide evidence. Sgt. Powers then looked in a window and saw the same activity. He went back to the porch and discussed what to do with Tpr. Pyles. They heard movement, smelled the very strong chemical odor, and they decided to make entry for the safety of the people inside and for themselves and their fellow officers. They kicked in the door and made entry.

Tpr. Pyles testified he had not tried to obtain a search warrant based only on the pseudoephedrine purchases. The officers were going to the residence only to speak with people to see if they wanted to talk. When asked if he believed he had probable cause before going to the trailer, he responded that he did not believe he did. The very strong odor and hearing people inside gave him the probable cause, and he went in for the safety of the occupants and the officers.

Deputy Caynor testified that on September 13, 2012, he was on duty. He had discussed the pseudoephedrine logs with the other officers, and they left to talk with Defendant. They knocked several times but there was no answer. He walked across the road to talk to neighbors. He saw a lady with a large dog. He did not approach further because she warned her bull mastiff was very territorial. He did ask the woman if her neighbors were home. At the time Sgt. Powers and Tpr. Pyles were on Defendant's front porch. Officer Linger was around the back somewhere. The two officers in front knocked several times and then asked him to come back. They made entry. He had

6

gone up on the porch. He noticed piles of trash and smelled a very strong chemical odor. He believed the odor was coming from inside the trailer and not from the trash, although he conceded that was possible. Tpr. Pyles left to get a search warrant. He was gone at least an hour.

Mary Frances Marsh, Defendant's aunt, testified that she lives just down the road from Defendant's trailer, and has to pass his trailer to go in and out of the road. Around September 13, 2012, there was nothing unique about Defendant's trailer other than the trash on the porch and that it was rather unkempt. She consulted her sister, Defendant's mother regarding the situation. She testified the trash "stank really bad–enough to make you sick when you passed." The windows of the trailer were covered with tablecloths, blankets, etc., and were blacked out. She had hardly ever been to the trailer. She could see every window from her home, though, and all the windows were blocked.

Tiara Howard testified she is Defendant's neighbor. She lives on the same road, directly across the road from Defendant. She lived there in September 2012. She didn't notice anything unusual about the trailer on the 13th. The windows were always covered. One could not see inside. She had never been inside the trailer, only on the front porch. She could see that the end window was covered.

William Trent Richardson, Defendant's father, testified that he lives on the same road as Defendant. His house is right below Defendant's trailer. Defendant's trailer is on his property. Originally he and his wife had bought the trailer, but Defendant had paid them back. Defendant had lived there approximately four years. There was nothing unusual about the trailer on September 13, 2012. Mr. Richardson testified that one cannot see inside the trailer from the front porch. There were blankets on the windows. They had been there at least 4-5 months. His son often worked

7

nights and slept on the couch. Mr. Richardson testified there was an issue with the trash on Defendant's front porch. It was full of stagnant water and smelled really bad. He and his wife cleaned it up after the search. They also pulled down all the window coverings.

Mr. Richardson testified that Officer Powers came to his house about 2:00 am on September 14, 2012, and told him officers had taken his son into custody. They "went in the house and found a meth lab." He said he had been driving down the road with his window open and smelled it. Mr. Richardson testified that Officer Powers never said he was on the front porch. Mr. Richardson also said that Officer Linger's testimony about going in the back door was inconsistent with the fact that there was a dryer and a couch in front of that door. After the search, Mr. Richardson and his wife went to the trailer and saw that someone had kicked the back door in. There had been a lot of visitors to his son's house, and a break in in May or June 2012. He also testified that he had seen Officer Powers at the residence in June. He had pulled in and was walking around. Officer Powers told him Defendant had a traffic violation. He looked around the underpinning and was trying to look in the windows.

Darlene Richardson, Defendant's mother, testified Defendant had lived there about three years. All the windows to the trailer were completely covered so one could not see inside. She thought he should take them down. She testified that girls came in and out and there were other people there. Girls had told her they didn't like him having the windows covered and other people there. She also testified there was a 30-gallon trash container on the front porch. On a warm day the smell was nauseating. It was full of trash and stagnant water. She didn't believe it was a chemical smell, but a stagnant water and trash smell.

Mrs. Richardson testified that Officer Powell contacted her and told her the lab found in her

8

son's residence was "the worst meth lab he had ever seen." He said he had been driving past with the window rolled down and smelled it.

The undersigned finds all the testimony credible to the point the individuals testifying had actual knowledge. The officers all corroborated each other's stories regarding meeting to discuss Defendant's pseudoephedrine purchases prior to approaching his residence. They all testified that they had driven to Defendant's residence to ask him about the purchases. They all testified that Officer Powers knocked on the door and there was no answer. The officers at the trailer all testified as to hearing movement inside the trailer. Two of the officers testified as to seeing Defendant appearing to be attempting to hide or destroy evidence. Every officer testified to the very strong odor of meth at the trailer, and also testified that it was a unique odor with which they had become familiar due to experience and/or training. They all testified as to the trash on the front porch.

The undersigned also finds Defendant's witness' testimony credible. They all testified about the trash on the front porch and that it gave off a nauseating odor. They all testified that the windows were all covered with some type of fabric and that one could not see in. Yet they all also testified that they were not often in or even at the trailer, if at all. None could testify that the very day the officers arrived all the windows were covered. In fact, one witness testified one could still see through one of the window coverings.

### IV. Motion to Suppress

"The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence." United States v. Wilhelm, 80 F.3d 116 (4th Cir. 1996). "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379,

9

63 L.Ed.2d 639 (1980) quoting United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961).

The Fourth Amendment to the Constitution of the United States provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." There is probable cause to search a home if there is a fair probability that evidence of a crime is located within the residence. See United States v. Murphy, 241 F.3d 447, 457 (6th Cir. 2001). Whether probable cause exists must be determined "under the totality of the circumstances." See Illinois v. Gates, 462 U.S. 213 (1983).

It is undisputed that the entry into and initial entry into and search of Defendant's residence was without a warrant. Warrantless entries into a person's home are presumptively unreasonable. U.S. v. Turner, 650 F.2d 526 (4th Cir. 1981). The United States Supreme Court holds:

> It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559, 124 S. Ct. 1284, 157 L.Ed.2d 1068 (2004)(*quoting Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L.Ed.2d 639(1980) (some internal quotation marks omitted)). Nevertheless, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions. *Flippo v. West Virginia*, 528 U.S. 11, 13, 120 S. Ct. 7, 145 L.Ed.2d 16 (1999) (*per curiam*); *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L.Ed. 2d 576 (1967). We have held, for example, that law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause. *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), to prevent the imminent destruction of evidence, *Ker v. California*, 374 U.S. 23, 40, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), or to engage in "hot pursuit" of a fleeing suspect, *United States v. Santana*, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976).

"[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincy v. Arizona*, 437 U.S. 385, 393-394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

Brigham City, Utah v. Stuart, 547 U.S. 398, 126 S. Ct. 1943 (2006).

### 1. Exigent Circumstances

In the recent case of Kentucky v. King, 131 S.Ct. 1849 (2011) the Supreme Court noted three broad categories of "exigent circumstances" serving as exceptions to the warrant requirement of the Fourth Amendment, to wit: (1) the emergency aid exception; (2) the hot pursuit exception; and (3) the prevention of imminent destruction of evidence exception. A district court's factual findings in such a case are reviewed for clear error, and its legal determination de novo. U.S. v. Hill, 649 F.3d 258 (4th Cir. 2011). In Brigham City, Utah v. Stuart, 547 U.S. 398, 126 S.Ct.1943, 164 L.Ed.2d 650 (2006), cited in Kentucky v. King, the United States Supreme Court stated as follows:

> One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Id.* at 392, 98 S.Ct. 2408 (quoting *Wayne v. United States,* 318 F.2d 205, 212 (C.A.D.C.1963) (Burger, J.)); see also *Tyler, supra,* at 509, 98 S.Ct. 1942. Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. *Mincey, supra,* at 392, 98 S.Ct. 2408; see also *Georgia v. Randolph,* 547 U.S. 103, ----, 126 S.Ct. 1515, 1525, 164 L.Ed.2d 208 (2006) ("[I]t would be silly to suggest that the police would commit a tort by entering ... to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur") . . . .
>
> . . . . An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed *objectively,* justify [the] action." *Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) (emphasis added). The officer's subjective motivation is irrelevant. See *Bond v. United States,* 529 U.S. 334, 338, n. 2, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000).

11

In addition to these well-established exigencies , the Supreme Court and the Fourth Circuit have held that more general "emergencies," if enveloped by a sufficient level of urgency, may also constitute an exigency and justify a warrantless entry and search. See generally, Brigham City, 547 U.S. at 403, 126 S.Ct. 1943; United States v. Hill, 649 F.3d 258 (4th Cir. 2011). In the very recent case of U.S. v. Yengel, - - - F.3d – - -, 2913 WL 563529 (4th Cir. 2013), the court stated:

> Under this more general emergency - as- exigency approach, in order for a warrantless search to pass constitutional muster, "the person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." *United States v. Moss, 963 F.2d 673 (4th Cir. 1992)*. An objectively reasonable belief must be based on specific articulable facts and reasonable inferences that could have been drawn therefrom. *See Mora v. City of Gaithersburg, 519 F.3d 216 (4th Cir. 2008)*(citing *Terry v. Ohio. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889)(1968)*.

In U.S. v Turner, 650 F.2d 526 (4th Cir. 1981), the Fourth Circuit provided an appropriate analysis for examining the district court's finding of exigent circumstances, citing U.S. v. Rubin, 474 F.2d 262 (3d Cir. 1973:

> The emergency circumstances will vary from case to case and the inherent necessities of the situation at the time mst be scrutinized . . . . The Court went on to catalog some of the factors courts have considered relevant in determining whether exigent circumstances exist in a particular case. These include: (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors or the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.

The Fourth Circuit also expanded on the above analytical framework in certain circumstances. For example, in U.S. v. Mora, 19 F.3d at 222 , the court noted that the same Fourth Amendment principles which give rise to the exigent circumstances justification for a warrantless search - - namely the balancing of the governmental interest in a protective search with the individual

12

interests at stake in the intrusion, viewed through the lens of objective reasonableness - - - also give rise to constitutionally permissible warrantless searches in what the court referred to as the "preventive action" context. In that case a warrantless search of a suspect's luggage, van, and apartment was constitutional, based on the overwhelming need to prevent harm to the public where police had received a hotline tip that the suspect was intent on committing mass murder. In doing so, the court emphasized, "[a]s the likelihood, urgency, and magnitude of a threat increase, so does the justification for and scope of police preventive action."

As far back as 1986, the Tenth Circuit held that the smell of certain chemicals along with other facts may create an exigent circumstance. In U.S. v. Echegoyen, 799 F.2d 1271 (1986), a civilian contacted the police after being awakened by what he thought to be the odor of a chemical coming from the outside. Two officers responded to the call, and met the civilian. As they and the civilian walked up the road to his house, one of the officers recognized the smell of ether. They determined the smell was emanating from a certain residence, and suspected that this house, in addition to being a fire hazard, was also the scene of illicit narcotics activity. With this in mind, the officers called a back-up deputy and the local fire department to the scene. The firefighter believed that the flammable ether posed a serious fire hazard and that immediate action was necessary. The officers entered the house and arrested the occupants.

The defendants in Echegoyen filed a motion to suppress the evidence. Echegoyen claimed that the behavior of the deputies before, during, and after the search, "reveal[ed] that the alleged exigent circumstances were nothing more than a pretext to allow a warrantless search." The Tenth Circuit first found that the evidence supported the conclusion that there was a potentially dangerous fire hazard present at the time. The circumstances also indicated that it was reasonable for the

officers to conclude that illicit drug activity was taking place. "The officers acted out of concern for the safety of the area and their own safety. Moreover, at the initial entry, the officers did not conduct any search of the area except to secure the suspects and to reduce the fire hazard." The court held: "The record in this case established that the existence of an explosive fire hazard and the possibility of illegal drug activity were exigent circumstances that justified the initial warrantless entry."

The Ninth Circuit in U.S. v. Wilson, 865 F.2d 215 (1989) similarly held. In that case police went to investigate a complaint of a chemical smell in a residential area. They determined that the odor was coming from Wilson's residence. They recognized the smell as that of ether. The also saw a liquid, which smelled like ether, pouring out of a garage, and heard movements from within the garage. One of the officers knew that ether is highly explosive and flammable. "He also knew that ether is commonly present during the manufacture of methamphetamine." The court held:

> The situation faced by the officers before their initial entry into the residence presented exigent circumstances justifying the warrantless entry. First, Officer Reynolds recognized a pressing need to prevent the ether from exploding and causing a fire. He had personal knowledge of the explosiveness of ether and had clear evidence of its presence. Second, Officer Reynold perceived a need to prevent the possible destruction of evidence or flight of suspects. Prior to Wilson's arrest, Reynolds had heard movements inside the garage. After Wilson's arrest, Reynolds reasonably believed that there might be other persons inside the house who might attempt to flee or destroy evidence. Moreover, it was reasonable for him to believe that the arrest of the Rileys near the front door of the residence might have announced the presence of the police to anyone inside. Finally, faced with a potential disaster in the form of an ether explosion and fire and with the possible destruction of evidence of flight of suspects, the police could properly conclude that they did not have sufficient time to obtain a search warrant. Thus, exigent circumstances existed because the totality of circumstances known to the police were such that a reasonable person could have believed that immediate entry was necessary to safeguard public safety and to preserve evidence.

Courts have more recently found that methamphetamine manufacturing itself creates an

exigent circumstance. In this case all the officers testified they smelled what they recognized, through experience and/or training, as a methamphetamine lab. Although neither party cited a Fourth Circuit case precisely on point, other courts have held that the presence of a meth lab can be an exigent circumstance on its own. The Eight Circuit has held:

> The dangers created by methamphetamine labs can justify an immediate search because of exigent circumstances "[d]ue to the volatile nature of such labs. *Kleinholz v. United States*, 339 F.3d 674 (8th Cir. 2003) . . . . The officers in *Keinholz* also smelled ether outside a residence where they had gone to investigate an anonymous tip about a methamphetamine lab. We held they were entitled to enter to search for a lab and that once it was seen, they could lawfully reenter to reduce the immediate risks of fire and explosion posed by such lab. *Id*. Similarly, in *United States v. Walsh, 299 F.3d 729 (8th Cir. 2002)*, a limited search without a warrant was upheld where officers had probable cause to believe they had discovered a methamphetamine lab. As the court noted there, the "potential hazards of methamphetamine manufacture are well documented, and numerous cases have upheld limited warrantless searches by police officers who had probable cause to believe that had uncovered an on-going methamphetamine manufacturing operation." *Walsh, 299 F.3d at 734* (collecting precedent from other circuits.)

U.S. v. Lloyd, 396 F.3d 948 (8th Cir. 2005).

In Walsh, supra, the defendant argued that officers' quick looks into a storage shed were unconstitutional, consistent with conducting a criminal investigation – not dealing with a public safety emergency. Walsh noted that the officers waited over an hour after initially smelling ether in the driveway, and failed to alert the neighbors and evacuate the occupants of the house, including several young children, after discovering what they believed to be an active methamphetamine lab. In addition, it took another officer over two hours to arrive on the scene after being informed that an active methamphetamine laboratory had apparently been discovered. The Eighth Circuit stated:

> The potential hazards of methamphetamine manufacture are well documented, and numerous cases have upheld limited warrantless searches by police officers who had probable cause to believe they had uncovered an on-going methamphetamine manufacturing operation. *See United States v. Wilson, 865 F.2d 215, 217 (9th Cir.

15

1989); United States v. Echegoyen, 799 F.2d 1271, 1278-79 (9th Cir. 1986); United States v. Brock, 667 F.2d 1311, 1318 (9th Cir. 1982), cert. denied, 460 U.S. 1022, 103 S.Ct. 1271, 75 L.Ed.2d 493 (1983); United States v. Williams, 630 F.2d 1322, 1326-27 (9th Cir.) Cert. denied sub nom. Murchison v. United States, 449 U.S. 865, 101 S.Ct. 197, 66 L.Ed.2d 83 (1980)(PCP lab); United States v. Erb, 596 F.2d 412, 418 (10th Cir.), cert. denied, 444 U.S. 848, 100 S.Ct. 97, 62 L.Ed.2d 63 (1979). See also United States v. Dick, 173 F.Supp, 2d 771 (E.D. Tenn. 2001)(methamphetamine lab in apartment complex warranted sentence enhancement under U.S.S.G.section 2D1.1(b)(6) because it "created a substantial risk of harm to human life").

The undersigned has found that at least one State has codified the exigent circumstances presented by a meth lab. Ohio Revised Code Section 293.33 states:

> If a law enforcement officer has probable cause to believe that particular premises are used for the illegal manufacture of methamphetamine, for the purpose of conducting a search of the premises without a warrant, the risk of explosion or fire from the illegal manufacture of methamphetamine causing injury to the public constitutes exigent circumstances and reasonable grounds to believe that there is an immediate need to protect the lives, or property, of the officer and other individuals in the vicinity of the illegal manufacture.

In this case the officers testified they arrived at Defendant's residence to question him about alleged excessive pseudoephedrine purchases. Upon arrival every officer testified he smelled a meth lab. All were experienced in the investigation of meth labs, and Trooper Pyles is certified in sampling and dismantling meth labs. He estimated he had seen at least 50 meth labs and had smelled all of those. He completed a 50-hour HazMat course in about 2011. He testified that meth labs can be explosive, can burn skin, are hazardous to inhale, and are flammable. All types, whether the older more complex cook or the more recent "shake and bake" method are dangerous. In the close confines of a single-wide trailer, as is the case here, the situation is more volatile since the vapor is more concentrated. The right fuel/air mix plus a fire source or spark can cause an explosion.

The officers went to the trailer and knocked. They heard movement inside, saw lights on inside, and saw cars parked in the driveway. When they knocked, however, nobody answered the

door.  The smell of a meth lab was very strong.  Every officer testified that the main, if not only, reason for going into the house was the safety of the residents and the officers themselves, as well as the possibility that evidence would be destroyed.  This testimony is corroborated by the fact that the officers seized nothing from the trailer at that time, but instead only got the people out of the house, checked for other occupants, and went outside.  They removed nothing but people.  They waited approximately an hour for a search warrant.

Nor does it appear that it would have been practical for the officers to get a warrant before entering the residence.  It took Trooper Pyles over an hour to get a warrant even after the warrantless entry.  Meanwhile, had the officers not removed the occupants, they would have still been inside the trailer under hazardous circumstances.  The officers, who would need to safeguard the residence while the search warrant was sought, would also have been put in grave danger.

Another exception to the warrant rule is when officers have a reasonable belief that contraband or other evidence is present and may be destroyed or removed before a search warrant could be obtained.  Mincey v. Arizona, 437 U.S. 385, 392-394 (1978); United States v. Taylor, 90 F.3d 903, 907 (4th Cir. 1996);  United States v. Turner, 650 F.2d 526, 528 (4th Cir. 1981); United States v. Grissett, 825 F.2d 776, 778 (4th Cir. 1991); United States v. Moss, 963 F.2d 673, 679-680 (4th Cir. 1992); and United States v. Reid, 929 F.2d 990, 993-994 (4th Cir. 1991).

The police are not required to "produce concrete proof" that evidence was on the verge of being destroyed; "rather, the proper inquiry focuses on what an objective officer could reasonably believe."  United States v. Grissett, 925 F.2d 776 (4th cir. 1991).  Here the officers could reasonably believe that evidence was on the verge of being destroyed.  They knocked on the door and got no response, despite knowing at least one person was in the home.  There were cars parked outside,

lights on inside, and they heard footsteps after they announced their presence. At least two officers testified they saw Defendant through a window appearing to be hiding and appearing to be disposing of evidence. Although witnesses for Defendant testified credibly that the windows in the residence were "always" covered, none of those witnesses resided in the trailer, and none had been there that day. Further, one testified that one window covering still allowed one to see inside the trailer. It was night time at the time of the incident and lights were on inside the trailer, making it more easy to see through window coverings. Finally, and perhaps most importantly, Tpr. Pyles testified he would have entered the trailer solely based on the danger presented by what he, in his experience and training, considered to be an active or very recently active meth lab, even without knowing that evidence was being destroyed.

Defendant argues that there was no reason officers could not get a search warrant. They had met at the fire hall for a half hour before even leaving for the trailer. Two or three days after the search they told Defendant's parents they could close the doors and windows. Counsel asked, "How could the chemicals be an exigent circumstance only two days earlier?

Based on the totality of the circumstances and the credible evidence, the undersigned finds the situation faced by the officers before their initial entry into the residence presented exigent circumstances justifying the warrantless entry. The evidence therefore is admissible. Further, because the initial entry did not violate defendant's constitutional rights, the subsequent search warrant and statements are also admissible.

Having found the search and seizure were constitutional and the evidence seized and subsequent statements made are admissible, the undersigned does not reach the question of inevitable discovery raised by the Government.

**RECOMMENDATION**

For the reasons herein stated, it is **RECOMMENDED** that Defendant's Motion to Suppress Evidence [Docket Entry 25] be **DENIED**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to direct this Report and Recommendation to counsel of record.

Respectfully submitted this 11th day of April, 2013.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE